## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

)
ASPIRE THERAPY SERVICES       )
CONSULTANTS, INC.,           )
                             )
           Plaintiff,       )        No. 23-253
                             )
          v.             )        Filed: May 30, 2023
                             )
THE UNITED STATES,        )        Re-issued: June 13, 2023*
                             )
          Defendant.      )
_____ )

## OPINION AND ORDER

Plaintiff, Aspire Therapy Services & Consultants, Inc. ("Aspire"), filed this pre-award bid protest challenging the Defense Commissary Agency's ("DeCA") decision to eliminate its proposal from further consideration in a procurement of shelf stocking, receiving/storage/holding area, custodial, and related services at the Dover Air Force Base Commissary. The basis for rejection was that Aspire's number of direct labor hours reflected in two different spreadsheets submitted with its proposal did not match. Aspire contends DeCA abused its discretion by failing to allow it to resolve the error through clarification. Before the Court are the parties' Cross-Motions for Judgment on the Administrative Record. For the reasons discussed below, the Court **GRANTS** Aspire's Motion for Judgment and **DENIES** the Government's Cross-Motion.

---

\* The Court issued this opinion under seal on May 30, 2023, and directed the parties to file any proposed redactions by June 6, 2023. The opinion issued today incorporates the proposed redactions filed by the parties. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 10). Redacted material in charts is blacked out, and redacted material in the body of the opinion is represented by bracketed ellipses "[. . .]."

# I.    BACKGROUND

## A.    The Solicitation

DeCA issued Solicitation No. HQC00822R0023 on October 5, 2022, seeking proposals for the award of a negotiated firm-fixed price contract for loading, stocking, and custodial work at the Dover Air Force Base Commissary.  Admin. R. 3, 87 (hereinafter "AR").[1]  Commissaries are stores similar to commercial supermarkets that sell food and other items to authorized patrons at military bases.  AR 100.  To support DeCA's commissary services, the procurement at issue requires the selected contractor to "furnish all personnel, supervision, supplies, equipment, tools, materials and other items and services as necessary to perform shelf stocking, receiving/storage/holding area (RSHA), and custodial tasks . . . at the Dover Air Force Base . . . ."  AR 100.

Per the solicitation, DeCA intends to use three factors to evaluate proposals: Factor 1 – Performance Capability; Factor 2 – Past Performance; and Factor 3 – Price.  AR 90–91.  The Performance Capability and Past Performance factors combined are deemed relatively equal in importance to the Price factor.  AR 91.  To evaluate the Price factor, DeCA intends to use a price realism analysis, wherein proposals will be evaluated "to determine whether offered prices are realistic in relation to the work to be performed, reflect a clear understanding of the requirements, and are consistent with other portions of the offeror's proposal."  AR 92.

The solicitation required offerors to submit their proposals in three volumes through the Procurement Integrated Enterprise Environment ("PIEE") system.  AR 86.  Volume I required offerors to break down their proposed services and prices and submit a Cost Breakout spreadsheet

---

[1] For ease of reference, citations to the administrative record refer to the bates-labeled page numbers rather than the ECF page numbers.  Citations to the native versions of certain Excel spreadsheets refer to the relevant tab number, as these files are not available on ECF.  *See* Def.'s Notice, ECF No. 24.

via Microsoft Excel.  AR 86.  Volume II required offerors to provide a Technical Capability and Personnel Proposal via PDF and a Direct and Indirect Labor Summary via Microsoft Excel.  AR 87.  Volume III required offerors to provide past performance information via PDF.  AR 87.  The Volume I Cost Breakout spreadsheet and the Volume II Direct and Indirect Labor Summary spreadsheet both included formulas that automatically generated various computations.  AR 86.  To allow offerors to complete the computations, "the necessary inputs [were] 'unprotected' and [could] be changed as needed to adequately reflect [an offeror's] proposal."  AR 86.  The solicitation warned that "[t]he offeror is ultimately responsible for the accuracy of all calculations."  AR 86.

The solicitation also informed offerors that they "may have to present the same information, in the same or different format, in more than one volume."  AR 86.  As such, DeCA instructed offerors to "[e]nsure information and statements on similar topics (e.g., number of work hours and productivity rates) are consistent throughout the proposal."  AR 86.  Twice more the solicitation instructed offerors to ensure data entries agreed across different parts of the offeror's proposal.  AR 87 ("When completing the [Direct and Indirect Labor Summary], enter all of the data requested, ensuring your data entries agree with the information provided in other parts of your proposal and computations are correct."); AR 242 (direct productive hours proposed in the Direct and Indirect Labor Summary "should match exactly the direct productive hours shown in your cost worksheets").  And the solicitation warned offerors twice that "[p]roposals that fail to comply with the content or format requirements may be rejected without further evaluation."  AR 85; *see* AR 90 ("Proposals that fail to comply with content or format requirements specified in Section L of this solicitation may be rejected without further evaluation.").

**B.      Aspire's Proposal**

Aspire submitted its proposal on October 15, 2022.  AR 348.  On January 6, 2023, DeCA informed Aspire that it was rejecting its proposal without further consideration.  AR 1106.  DeCA explained:

> Your proposal failed to comply with the requirements of Section L, Provision 52.215-4509 Proposal Submission (Format and Content) (APR 2004) identified in the solicitation and is being rejected without further evaluation due to the hours proposed in the Volume I, Cost Breakout did not correlate with the hours in the Volume II, Direct Labor Summary.

AR 1106.

In its Volume II Direct and Indirect Labor Summary spreadsheet, Aspire provided the following information involving Receiving/Storage/Holding Area ("RSHA") Direct Labor:

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 15 | | | Receiving/Storage/Holding Area Direct Labor | | |
| 16 | | *Offload Trucks* | | | |
| 17 | | Cases per Year | Productivity Rate (cases per person per productive hour) | Direct Productive Hrs Required (cases/productivity rate) | |
| 18 | | 371,148 | | | |
| 19 | | *Transport Merchandise* | | | |
| 20 | | Cases per Year | Productivity Rate (cases per person per productive hour) | Direct Productive Hrs Required (cases/productivity rate) | |
| 21 | | 99,912 | | | |
| 22 | | *Segregate Merchandise* | | | |
| 23 | | Cases per Year | Productivity Rate (cases per person per productive hour) | Direct Productive Hrs Required (cases/productivity rate) | |
| 24 | | 370,656 | | | |
| 25 | | *Store Merchandise* | | | |
| 26 | | Cases per Year | Productivity Rate (cases per person per productive hour) | Direct Productive Hrs Required (cases/productivity rate) | |
| 27 | | 30,144 | | | |
| 28 | | *Pull Merchandise* | | | |
| 29 | | Cases per Year | Productivity Rate (cases per person per productive hour) | Direct Productive Hrs Required (cases/productivity rate) | |
| 30 | | 30,144 | | | |
| 31 | | *RSHA Coverage for Contractor Work Schedule* | | Direct Productive Hrs Required | |
| 32 | | *(if required)* | | 81 | |
| 33 | | Receiving/Storage/Holding Area Direct Labor | | Direct Productive Hrs Required | |
| 34 | | Subtotal | | 2,366 | |

AR Tab 4.b.1. (Native Excel).  The original spreadsheet provided by DeCA to offerors included the anticipated "Cases per Year" under each labor subcategory (*e.g.*, Offload Trucks, Transport Merchandise, etc.) in Column B, and offerors were required to input their "Productivity Rate" for each labor subcategory in Column C.  AR Tab 2.e.1. (Native Excel).  The spreadsheet automatically populated the "Direct Productive Hrs Required" in Column D by dividing cases per year by the offeror's provided productivity rate for each labor subcategory except "RSHA Coverage for Contractor Work Schedule" in cell D32.  AR Tab 2.e.1.  For cell D32, offerors directly entered their "Direct Productive Hrs Required," and Aspire entered the number "81" using the formula "=2366-2285".  AR Tab 4.b.1.  The spreadsheet then automatically populated the total "Direct Productive Hrs Required" in cell D34 for the RSHA labor category by adding the "Direct Productive Hrs Required" for each subcategory.  AR Tab 2.e.1.  Based on Aspire's inputs, its total "Direct Productive Hrs Required" for RSHA Direct Labor totaled 2,366 hours.  AR Tab 4.b.1.

In the Volume I Cost Breakout spreadsheet, offerors were again required to provide a breakdown of RSHA labor hours.  AR Tab 2.c.1 (Native Excel).  Unlike the Volume II Direct and Indirect Labor Summary spreadsheet, the Cost Breakout spreadsheet categorized hours by laborer, not by subtasks.  Aspire provided the following information in its Cost Breakout spreadsheet:



AR Tab 4.a.1 (Native Excel). Offerors manually inputted the total hours required of each laborer (*e.g.*, Forklift Operator, Material Handling Laborer, etc.) as well as the total Indirect Labor Hours in Column C. AR Tab 2.c.1. The Direct Labor Hours were then automatically calculated by subtracting the Indirect Labor Hours from the sum of the four laborers' hours. AR Tab 2.c.1.

In cell C16, Aspire created the following formula to populate the labor hours for the Material Handling Laborer: "=[. . .]+[. . .]+[. . .]+[. . .]+51-[. . .]", which resulted in a sum of [. . .]. AR Tab 4.a.1. Aspire explains that it pulled those numbers from the RSHA direct labor chart in its Volume II Direct and Indirect Labor Summary spreadsheet—transport merchandise ([. . .]), segregate merchandise ([. . .]), store merchandise ([. . .]), pull merchandise ([. . .]), and RSHA coverage for contractor work schedule (81)—as these were the tasks to be completed by the Material Handling Laborer. Pl.'s Mot. for J. on Admin. R. at 11–12, ECF No. 21-1; *see* AR 468. Critically, Aspire states that the inclusion of the number 51 in the cell C16 formula was a typo, and it should have entered 81—the correct number from the Direct and Indirect Labor Summary spreadsheet. ECF No. 21-1 at 12. As a result of this typo, the Material Handling Laborer hours

were 30 hours less than intended, as were the total Direct Labor Hours in cell C26. *Id.* at 13. Accordingly, the spreadsheet totaled the RSHA direct labor hours as 2,336 in the Volume I Cost Breakout spreadsheet in contrast with the 2,366 total in the Volume II Direct and Indirect Labor Summary spreadsheet. *Compare* AR 400, *with* AR 468. Aspire explains that had it not made an input error causing the 30-hour difference in its Cost Breakout spreadsheet, its proposed price would have been $[. . .] higher over five years, which amounts to a 0.063 percent increase of its total proposed price. ECF No. 21-1 at 29.

### C.    Pre-Award Debrief

On January 9, 2023, Aspire requested a pre-award written debrief pursuant to subpart 15.505 of the Federal Acquisition Regulations ("FAR"). AR 1109. On February 8, 2023, DeCA provided responses to several of Aspire's questions about its proposal and confirmed that Aspire's disqualification was due to the 30-hour discrepancy in direct labor hours between the relevant Volume I and Volume II spreadsheets. AR 1112. Specifically, DeCA explained that "[t]he total Direct Labor in volume II of the proposal for RSHA services was 2,366 hours. The total Direct Labor in volume I of the proposal for RSHA was 2,336 hours." AR 1112. In response to Aspire's question about whether DeCA considered "asking Aspire to clarify the concern pursuant to FAR 15.306 Exchanges," DeCA stated that "[t]he agency determined the error was not a minor clerical error pursuant to FAR 15.306 and therefore determined clarifications could not be conducted." AR 1113.

### D.    Other Proposals

DeCA received seven other proposals in response to the solicitation. AR 247, 474, 564, 663, 779, 863. In addition to Aspire, DeCA rejected the proposals of [. . .] and [. . .] without further consideration on January 6, 2023. AR 1105, 1108. [. . .]. AR 1105. [. . .] was disqualified

because, like Aspire, "the hours proposed in the Volume I, Cost Breakout did not correlate with the hours in the Volume II, Direct Labor Summary."  AR 1108.  Unlike Aspire, however, the discrepancy between the proposed hours in [. . .]'s proposal was a [. . .]-hour difference.  *Compare* AR 715 ([. . .] hours proposed in Volume I Cost Breakout spreadsheet), *with* AR 770 ([. . .] hours proposed in Volume II Direct and Indirect Labor Summary spreadsheet).

[. . .] offered the lowest-priced proposal at $[. . .].  AR 488.  Aspire's proposed price was the second lowest at $[. . .].  AR 394.  [. . .] proposed the highest price at $[. . .].  AR 709.  And [. . .] proposed the second highest price at $[. . .].  AR 297.

**E.    Procedural History**

On February 22, 2023, Aspire filed its Complaint alleging that DeCA's disqualification of its proposal was arbitrary and capricious and that DeCA abused its discretion by not allowing Aspire to clarify the labor hour discrepancy in its proposal.  *See* Pl.'s Compl. ¶ 30, ECF No. 1. Aspire asks the Court to declare that DeCA's decision was an arbitrary abuse of discretion, and order DeCA to allow Aspire to clarify the minor or clerical error in its proposal and compete for the award.  *Id.* at 13 ("Request for Relief").  On March 24, 2023, Aspire filed its Motion for Judgment on the Administrative Record seeking relief on the same bases raised in its Complaint. *See* ECF No. 21-1.  Aspire argues that its spreadsheet error was a minor clerical error that could have been resolved through clarification.  *Id.* at 19.  As such, Aspire argues DeCA abused its discretion by failing to seek such a clarification from Aspire.  *Id.* at 34.

On April 10, 2023, the Government filed its Cross-Motion for Judgment on the Administrative Record.  *See* Def.'s Cross-Mot. for J. on Admin. R., ECF No. 25.  The Government argues that Aspire's failure to match labor hours between its spreadsheets was a material error that constituted noncompliance with the Solicitation's terms and that could have been resolved only

through discussions, not a clarification.  *Id.* at 13, 19.  Therefore, the Government argues DeCA reasonably exercised its discretion when it refrained from requesting a clarification from Aspire and instead rejected its proposal.  *Id.* at 16.

The Motions are now fully briefed and ripe for decision.  *See* Pl.'s Resp. in Support of Mot. for J. on Admin. R., ECF No. 26; Def.'s Resp. in Support of Cross-Mot. for J. on Admin R., ECF No. 27.  The Court held oral argument on May 10, 2023.

## II.   LEGAL STANDARDS

### A.   Motions for Judgment on the Administrative Record

Rule 52.1(c) of the Rules of the United States Court of Federal Claims governs motions for judgment on the administrative record.  Such motions are "properly understood as . . . an expedited trial on the record."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.   Bid Protest Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . ."  28 U.S.C. § 1491(b)(1).  In such actions, the

Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act.  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa*, 238 F.3d at 1332.  To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process."  *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error."  *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

In reviewing an agency's procurement decisions, the Court does not substitute its judgment for that of the agency.  *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations").  The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues . . . ."  *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities."  *Bromley Contracting Co. v. United States*, 15 Cl. Ct.

100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).  A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333.  "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

## III.  DISCUSSION

Aspire's challenge to DeCA's disqualification decision presents two questions: (1) did DeCA rationally determine that the 30-hour difference in labor hours reflected on two spreadsheets in Aspire's proposal was not a minor clerical error that could be clarified pursuant to FAR 15.306(a)(2), and (2) did DeCA abuse its discretion by declining to seek clarification.  The Court agrees with Aspire on both issues.  The spreadsheet error was both minor and clerical, and DeCA abused its discretion by failing to request a clarification from Aspire.

**A.     Aspire Made a Minor Clerical Error that May Be Resolved through Clarification.**

1.     Clarifications Are Permitted to Resolve Minor or Clerical Errors.

The FAR allows procuring agencies to engage in clarifications, which are defined as "limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated."  FAR 15.306(a)(1) (2022).  The regulations provide that "[i]f award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors."  FAR 15.306(a)(2) (2022).

In contrast to clarifications, discussions involve negotiations.  They "are exchanges, in . . . a competitive . . . environment, between the Government and offerors" that "are undertaken with

the intent of allowing the offeror to revise its proposal," FAR 15.306(d) (2022), which may include "alter[ing] or explain[ing] to enhance materially the proposal's potential for award," FAR 15.306(d)(3) (2022).  Discussions may also involve bargaining, which includes "persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract."  FAR 15.306(d). Discussions take place after the Government has established a competitive range; and if the Government chooses to engage in discussions, it must do so with each offeror still under consideration.  FAR 15.306(d)(3).

Under prior iterations of the regulations, clarifications had a narrower scope.  They were previously allowed "for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal."  FAR 15.601 (1991).  That definition was significantly broadened in 1997 to "provide for empowerment and flexibility" and to "shift from rigid rules to guiding principles."  *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1321 (Fed. Cir. 2003) (quoting Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. 51,224, 51,225 (Sept. 30, 1997) (to be codified at FAR 15.306)).  Specifically, the 1997 amendments were intended to "[s]upport[] more open exchanges between the Government and industry, allowing industry to better understand the [Government's] requirement [sic] and the Government to better understand industry proposals."  *Id.* (second alteration added) (quoting Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. at 51,224).  The current rule seeks to "allow as much free exchange of information between offerors and the Government as possible" and "help offerors, especially small entities that may not be familiar with proposal preparation, by permitting easy clarification of limited aspects of their proposals."  *Id.*

(quoting Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. at 51,228–29).

While the scope of clarifications has been broadened, they are nevertheless permitted only to "clarify certain aspects of proposals" and "resolve minor or clerical errors." FAR 15.306(a)(1). Clarifications are not permitted to materially revise aspects of a proposal, such as technical or cost elements, or to cure material omissions or deficiencies, which are exchanges properly reserved for discussions. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998 (Fed. Cir. 2018). But the resolution of minor or clerical errors through clarification may involve making minor corrections to a proposal. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1333 (Fed. Cir. 2004). It may also include the provision of new or additional information, including with respect to information that is "essential for evaluation of the proposal." *Info. Tech.*, 316 F.3d at 1323.

For example, the United States Court of Appeals for the Federal Circuit had held that the correction of a mathematical error in a proposal that increased an offeror's bid price constituted a clarification rather than a discussion. *Galen*, 369 F.3d at 1333. In *Galen*, the plaintiff alleged that the Government impermissibly engaged in discussions by allowing a single offeror to alter its bid price. *Id.* at 1332–33. The Court held there was insufficient evidence to establish such communications occurred but found that even if communications between the bidder and the agency did lead to an alteration of the bid price, the change "was in the nature of a correction of an obvious mathematical error" and "actually increased [the bidder's] bid price." *Id.* at 1333. For these reasons, the Court held the correction "would fall squarely within the definition of 'clarification' rather than 'discussion.'" *Id.*

Following *Galen*, this court had held that an error in a proposal's contract line item numbers ("CLINs") that increased the offeror's bid price was properly corrected through clarification.

*DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 545 (2007). In *DynCorp*, an offeror underreported several cost-reimbursable CLINs, which "carried through to the summary page of [its] price proposal." *Id.* at 544. The agency requested a correction of the error, which resulted in a minor increase of the offeror's price. *Id.* at 545. The court explained that "a mathematical clarification which causes the successful offeror's price to go up, and thus makes the offer less attractive to the government, is less likely to be found improper." *Id.* It also noted that "[a]ll of the information needed to correct the CLIN amounts was present in [the offeror's] proposal." *Id.* Accordingly, *DynCorp* held that "[t]his type of minor mathematical correction, where the government already has the information it needs in order to make an evaluation of a bidder's price, is a clarification, not a discussion." *Id.*

Similarly, another judge of this court found the correction of typographical errors contained in proposal spreadsheets to constitute clarifications rather than discussions. *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 270 (2021). In *WaveLink*, the Government allowed several offerors to correct minor errors to their labor rates contained in various spreadsheets in their proposals. *Id.* The court found that the incorrect labor rates resulted from typographical errors that were apparent on their face, since the correct rates were available elsewhere in the proposals. *Id.* For example, one offeror "omitted one rate on a spreadsheet tab, but another tab contained the applicable rate and its supporting documents demonstrated that [the offeror] intended to provide the exact same direct labor rates on both tabs of their Volume 6 pricing template." *Id.* (internal quotations and alterations omitted). Another offeror "provided one labor rate at $[**] instead of $[**], which was the correct rate identified in a different spreadsheet tab delineating the same or similar data." *Id.* Other irregularities included a "clear transposition error" and erroneous rounding. *Id.* *WaveLink* held that because each of these communications "merely amounted to

14

correcting mistakes that were either clearly clerical or relatively minor errors or where the information was readily present elsewhere in the proposal," they constituted clarifications that did not rise to the level of discussions. *Id.*

 2. The Discrepancy in Aspire's Labor Hours Was a Minor Clerical Error.

DeCA determined that the error in Aspire's spreadsheets "was not a minor clerical error pursuant to FAR 15.306." AR 1113. The administrative record is devoid of any explanation of the agency's underlying rationale, and more importantly, the evidence in the administrative record does not rationally support such conclusion. Rather, it is apparent from the record that the discrepancy in Aspire's labor hours was a minor clerical error that could be corrected through clarification. DeCA's decision to disqualify Aspire was thus arbitrary and capricious in that regard.

First, from the face of Aspire's proposal alone, it should have been evident to DeCA that the discrepancy was likely typographical rather than deliberate. The mismatched labor hour numbers—2,336 and 2,366—are off by one digit and appear so similar that the error is easily overlooked by the naked eye, a strong indicator that Aspire had made a typographical error.

Moreover, the typographical nature of Aspire's error can be confirmed with virtual certainty by reviewing the formulas in the native versions of Aspire's spreadsheets, which it submitted to DeCA with its proposal via the PIEE system. Cell D34 in Aspire's Direct and Indirect Labor Summary spreadsheet calculated the RSHA Direct Labor Subtotal by adding together all RSHA labor subcategories for a total of 2,366 hours. AR Tab 4.b.1. Aspire manually entered the numbers of hours for the first five subcategories, the sum of which totaled 2,285 hours. AR Tab 4.b.1. In the final subcategory—RSHA Coverage for Contract Work Schedule (cell D32)—Aspire used the formula "=2366-2285", which produced the number 81. AR Tab 4.b.1. By using such

formula, Aspire guaranteed that the RSHA Direct Labor Subtotal in cell D34 would equal 2,366 hours, confirming 2,366 was the intended number.

Comparing this spreadsheet to the Cost Breakout spreadsheet makes clear that Aspire made a typo by inputting 51 instead of 81 in the Material Handling Laborer formula in the latter spreadsheet. Each of the first four numbers in the Material Handling Laborer formula ("=[. . .]+ [. . .]+ [. . .]+ [. . .]+51-[. . .]") correspond to RSHA labor subcategories in Aspire's Direct and Indirect Labor Summary spreadsheet in the same order they appear in that spreadsheet—transport merchandise ([. . .]), segregate merchandise ([. . .]), store merchandise ([. . .]), and pull merchandise ([. . .]). *Compare* AR Tab 4.a.1., *with* AR Tab 4.b.1. However, instead of inputting 81 hours as the fifth number in the formula, which correlates to the RSHA Coverage for Contractor Work Schedule subcategory, Aspire typed 51. AR Tab 4.b.1. This resulted in the 30-hour discrepancy in RSHA direct labor hours between the spreadsheets; had Aspire typed 81 instead of 51, the hours would have matched.

This sort of obvious typographical mistake is analogous to the types of mathematical errors in proposals that the Federal Circuit and this court have found to constitute minor or clerical errors rather than material ones. *See Galen*, 369 F.3d at 1333; *DynCorp*, 76 Fed. Cl. at 545; *WaveLink*, 154 Fed. Cl. at 270. Just as in *WaveLink*, Aspire made an obvious typo when inputting labor hours into its spreadsheets, and the correct information was "readily present elsewhere in the proposal." *WaveLink*, 154 Fed. Cl. at 270; *see DynCorp*, 76 Fed. Cl. at 545 (citing *IPlus, Inc.*, B298020, B-598020.2, 2006 CPD ¶ 90 (holding that clarification is permissible "where the existence of the mistake and the amount intended by the offeror is clear from the face of the proposal")). That Aspire's error was obviously typographical supports the conclusion that the error was minor and clerical and thus subject to clarification.

Second, the effect of Aspire's error on its proposed hours and price is minor, to say the least, and largely inconsequential to DeCA's evaluation. The typo led Aspire to underreport its RSHA labors hours in its Cost Breakout spreadsheet by a mere 30 hours. The Government argues that DeCA intends to use proposed labor hours to evaluate proposals under the Performance Capability and Price factors. ECF No. 25 at 15 (citing AR 90, 92). While the number of labor hours an offeror proposes will assist DeCA in determining whether the offeror understands the solicitation requirements and is able to fulfill them, it is difficult to see how an error totaling 30 hours—a 1.3 percent difference—could affect the agency's evaluation in a material way.

The same can be said for the price evaluation. It is true that correcting Aspire's error would also alter its total proposed price because labor hours drive costs. But according to Aspire, with the correct figure for labor hours in its Cost Breakout spreadsheet, its price would increase by only $[. . .] over five years—a mere 0.063 percent increase in total price. ECF No. 21-1 at 29. As *Galen* and *DynCorp* instruct, the correction of cost and/or price figures that lead to a modest increase in price may properly be addressed through clarification. *Galen*, 369 F.3d at 1333 (correction of mathematical error that increased bid price was permissible clarification); *see DynCorp*, 76 Fed. Cl. at 545 (same). Indeed, the impact that clarification would have on DeCA's evaluation vis-à-vis other offerors is nil because an increase of Aspire's price will place it at a competitive disadvantage, further underscoring the minor nature of its error. *DynCorp*, 76 Fed. Cl. at 545. Accordingly, that Aspire's error had an insignificant effect on its total proposed labor hours and price supports the conclusion that the error was minor and appropriately subject to clarification.

3.      The Government's Arguments to the Contrary are Unpersuasive.

Although its rejection letter did not set forth DeCA's rationale, the Government posits two arguments in support of the agency's determination that the mismatched labor hours in Aspire's spreadsheets was not a minor clerical error that could be addressed through clarification. Neither contention is persuasive.

a.      *Aspire Did not Violate a Material Provision of the Solicitation.*

The Government emphasizes that DeCA advised offerors three times in the solicitation that the labor hour numbers (and all other information) submitted in the different volumes of their proposals must match. ECF No. 25 at 14 (citing AR 86 ("Ensure information and statements on similar topics (e.g., number of work hours and productivity rates) are consistent throughout the proposal."); AR 87 ("enter all of the data requested, ensuring your data entries agree with the information provided in other parts of your proposal and computations are correct."); AR 242 ("The numbers shown in [the Direct and Indirect Labor Summary] should match exactly the direct productive hours shown on your cost worksheets.")). The Government contends that this was a material provision of the solicitation and that by failing to comply with its requirements Aspire committed a material error not amenable to clarification. *Id.* Indeed, the Government argues that because Aspire failed to comply with the solicitation DeCA was *required* to reject its proposal. *Id.* at 13–14 (citing *Allied Tech. Grp. v. United States*, 649 F.3d 1320, 1329 (Fed. Cir. 2011)).

As an initial matter, the solicitation contained no such requirement. Instead, it warned offerors that DeCA "*may* . . . reject[] without further evaluation" "[p]roposals that fail to comply with content or format requirements." AR 85 (emphasis added). Moreover, that Aspire's error led to noncompliance with the solicitation's submission instructions does not per se preclude the Government from allowing Aspire to correct its error through clarification. Several courts have

found that content and format errors can be addressed by clarification even where the error resulted in noncompliance.  *See, e.g.*, *Level 3 Commc'ns, LLC v. United States*, 129 Fed. Cl. 487, 505 (2016) (holding agency abused its discretion by failing to allow offeror to submit map in file format required by solicitation through clarification); *Griffy's Landscape Maint. LLC v. United States*, 46 Fed. Cl. 257, 261 (2000) (holding agency abused its discretion by failing to allow offeror to provide insurance information as required by solicitation through clarification).

As the Government correctly observes, other courts have held that if an offeror violates a solicitation provision that serves a substantive purpose, then the violation may constitute a material error rather than a minor or clerical error.  *See, e.g.*, *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 508 (2019).  A solicitation requirement may be found to further a substantive purpose "when it is important to the government's evaluation, is binding on the offeror, or has more than a negligible impact on the price, quantity, or quality of the bid."  *Id.*  Here, however, the Government has failed to meaningfully explain a substantive purpose for its content and format instructions that would render clarification improper in this case.  It primarily contends that by repeating the relevant instruction three times it is undisputedly a "material requirement" of the solicitation.  ECF No. 25 at 14.  But repetition alone does not make a solicitation provision material.  *See Bus. Integra, Inc. v. United States*, 116 Fed. Cl. 328, 336 (2014) (recognizing "the inability of an agency to declare an immaterial term to be a material one").  And that the solicitation permitted DeCA in its discretion to *reject or accept* a noncompliant proposal further undermines the argument that the instructions at issue are substantively material.  *See* AR 85.

Instead, the Court must look to the substantive nature or character of the solicitation provision.  The Government argues that the requirement of matching labor hours serves a substantive purpose and is important to the evaluation because DeCA will use offerors' proposed

labor hours to evaluate the Price and Performance Capability factors.  ECF No. 25 at 14–15.  Of course, the number and breakdown of an offeror's proposed labor hours will have a substantive impact on DeCA's evaluation.  But the requirement that labor hours in different parts of a proposal exactly match does not further the substantive purpose of ensuring offerors propose sufficient labor hours if the reason for the discrepancy is purely and obviously clerical.  To hold otherwise would elevate a provision that in essence encouraged offerors to submit consistent and accurate proposals, something that should be implicit in every procurement, to a material term that would prevent the agency and offerors from resolving the very type of minor or clerical error that clarifications were meant to address.  The Federal Circuit has counseled against such a "cramped conception of 'clarification,'" even in circumstances where clarification is necessary for further evaluation of the proposal.  *Info. Tech.*, 316 F.3d at 1323 ("There is no requirement in the [FAR] that a clarification not be essential for evaluation of the proposal.").  Furthermore, as explained above, Aspire's error had such a minor effect on the price and quality of its bid that the impact on the agency's substantive evaluation here is negligible.

> b.    *That Aspire's Error Affected Its Price Does Not Prevent Clarification.*

The Government next argues that Aspire's error was material because it affected Aspire's price and would require a revision of the price proposal.  ECF No. 25 at 17.  As explained, that an error affected an offeror's price does not necessarily preclude it from being a minor or clerical error, and errors that slightly raised an offeror's price have been found to be errors that can be resolved by clarification.  *Galen*, 369 F.3d at 1333; *see DynCorp*, 76 Fed. Cl. at 545.  In such cases, the change was considered a correction, not a revision of the proposal that would require the agency to hold discussions.  *See id.*

Nevertheless, the Government relies on two cases from this court to support its materiality argument. ECF No. 25 at 18–19. Both cases are distinguishable. The Government first cites *ST Net, Inc. v. United States*, 112 Fed. Cl. 99, 109 (2013). In *ST Net*, the plaintiff completely failed to enter the price and brand/model information for two line items in its proposal, which the court concluded was a material error that could not be corrected through clarification. *Id.* at 109–10. Unlike Aspire's error, *ST Net* involved an omission of material information that resulted in a "fundamentally flawed" proposal. *Id.* at 111. As the Federal Circuit held in *Dell Federal Systems*, clarifications are inappropriate to "cure proposal deficiencies or material omissions." 906 F.3d at 998. Conversely, Aspire's mismatched labor hours resulted from a typo that created "an obvious mathematical error," and the correct labor hour figure was apparent in Aspire's proposal despite the error. *Galen*, 369 F.3d at 1333. Furthermore, the omission in *ST Net* led to a seven percent price increase, a much more significant variance that the 0.063 percent price difference resulting from Aspire's error. *ST Net*, 112 Fed. Cl. at 110.

The Government also relies on *Mission1st Group, Inc. v. United States*, 144 Fed. Cl. 200, 217 (2019). In that case, the plaintiff's expense rates in its proposal did not match its supporting documentation, which was a requirement of the solicitation. *Id.* at 216. The court held that because "the [contracting officer] had no way of knowing from the face of Mission1st's proposal whether it was the cost narrative or the formulas used in the cost proposal that were incorrect[,] [t]he errors were . . . substantive, not clerical, in nature." *Id.* at 217. Unlike *Mission1st*, however, DeCA could have readily determined through Aspire's proposal the correct labor hours it intended to propose, as well as the typographical error that caused the 30-hour difference. *See supra* § III.A.2.

*     *     *

In sum, DeCA's determination that Aspire's error was not a minor clerical error lacks a rational basis. The administrative record shows that Aspire's error was both obvious and typographical, and it had an insignificant effect on the labor hours proposed in the Cost Breakdown worksheet and, as a result, Aspire's proposed price. Accordingly, DeCA could have allowed Aspire to resolve the error through clarification.

**B.**   **DeCA Abused Its Discretion by Failing to Allow Aspire to Correct Its Error Through Clarification.**

Whether a clarification was permissible does not end the inquiry, however, because the decision to engage in clarifications with an offeror in a procurement under FAR Part 15 lies within the discretion of the procuring agency. FAR 15.306(a)(2) ("offerors *may be* given the opportunity to clarify certain aspects of proposals" (emphasis added)). "Nonetheless, the permissive language of the clarification provisions in Part 15 does not mean that those provisions are not susceptible to judicial enforcement." *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 510 (2013). Although the parties each cite cases supporting their respective positions on whether DeCA reasonably exercised its discretion, there appears to be no bright line rule or legal test applicable to the Court's review of this issue. Courts that have reviewed claims involving an agency's failure to seek clarification employ a highly fact-intensive and case-specific analysis. Nevertheless, several common factors have led courts to conclude that an agency's decision to forgo clarification was an abuse of discretion.

For example, an agency is more likely to abuse its discretion by not seeking clarification when a proposal contains an error that is especially minor and can be easily corrected. *See Level 3 Commc'ns*, 129 Fed. Cl. at 504 ("[T]he omission of the .kmz file in this case was an oversight that easily could have been corrected. It was not a major omission that made it impossible to fully

22

evaluate Level 3's proposal."); *Griffy's Landscape Maint.*, 45 Fed. Cl. at 258–59 ("a brief phone

call would have remedied the error").  The obviousness of an error from the face of a proposal also

weighs in favor of finding the agency unreasonably failed to seek clarification.  *See Criterion Sys.,*

*Inc. v. United States*, 140 Fed. Cl. 29, 37 (2018) ("[T]he obviousness of the error is an important

aspect of determining whether the CO acted reasonably by not seeking clarification."); *Griffy's*

*Landscape Maint.*, 45 Fed. Cl. at 259 (explaining that one of the goals of clarification is to ensure

the Government "does not take advantage of obvious contractor errors").  The competitiveness of

an offeror's price likewise strengthens the case for clarification.  *See BCPeabody Constr. Servs.*,

112 Fed. Cl. at 512 ("Given BCPeabody's significantly lower bid, the contracting officer had

virtually overwhelming cause to contact BCPeabody about the clerical error . . . ."); *Level 3*

*Commc'ns*, 129 Fed. Cl. at 505 ("In this case, as in *BCPeabody*, the CO had 'virtually

overwhelming cause' to seek clarification from Level 3, because of its 'significantly lower'

price.").  And the existence of information elsewhere in a proposal that could correct or clarify an

error further supports a finding that the agency abused its discretion by not seeking clarification.

*See BCPeabody Constr. Servs.*, 112 Fed. Cl. at 512 ("The contracting officer had all of the

information she needed about BCPeabody's proposal, including all price information . . . .").

All of these factors are present here.  As explained above, Aspire's error was minor and

had a demonstrably insignificant effect on the evaluation.  It also was a simple typographical

mistake, as opposed to a deliberate decision, that was obvious from the face of the proposal.

Indeed, Aspire could remedy the error by adjusting the labor hours in its Cost Breakdown

spreadsheet by just one digit, with a concomitant minor adjustment to its price proposal.  Likewise,

despite its error, all the information needed to determine the correct labor figure was contained in

Aspire's Direct and Indirect Labor Summary spreadsheet.  A clarification would thus serve merely

to confirm Aspire's evident intent.  Moreover, Aspire had a highly competitive price, being the second lowest price of all offerors and not much higher than the lowest priced proposal submitted by [. . .].  *Compare* AR 488 ([. . .]'s price at $[. . .]), *with* AR 394 (Aspire's price at $[. . .]).  Each of these facts supports the conclusion that DeCA abused its discretion by failing to seek clarification from Aspire.

Relying on the same group of cases (*e.g.*, *ST Net* and *Mission1st*), the Government contends that DeCA did not abuse its discretion because it properly concluded that Aspire's error was material, would affect Aspire's price proposal, and thus could be resolved only through discussions.  ECF No. 25 at 17–19.  But as explained above, the Government's arguments are not persuasive and the cases it cites are distinguishable.  *See supra* § III.A.3.  Aspire's error was not material and should properly have been resolved through clarification.

Accordingly, the Court concludes that DeCA abused its discretion by failing to allow Aspire to clarify what was an obviously minor clerical error that could easily be corrected, where the information needed to understand and correct the error was contained in Aspire's proposal and where Aspire submitted a highly competitive price.  In so holding, the Court acknowledges the broad discretion of agencies in conducting procurements in general, and specifically in requesting clarification in Part 15 procurements.  *See Impresa*, 238 F.3d at 1332–33; FAR 15.306(a)(2).  But where the correction of an error fits comfortably within the definition of a clarification, the FAR expresses a strong policy preference in favor of clarification.  *See Info. Tech.*, 316 F.3d at 1321–22.  The 1997 amendments resulting in FAR 13.506 were enacted "to provide for empowerment and flexibility[,] . . . end unnecessary regulatory requirements[,] . . . and shift to a new emphasis on choosing 'best value' products."  Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. at 51,225; *see also Info. Tech.*, 316 F.3d at 1321.  The rule is meant

to "help offerors . . . by permitting easy clarification of limited aspects of their proposals." *Info. Tech.*, 316 F.3d at 1321 (quoting Contracting by Negotiation and Competitive Range Determination, 62 Fed. Reg. at 51,228–29). DeCA's disqualification decision runs contrary to these goals by rigidly rejecting a competitively priced proposal for an evident typographical mistake without providing any opportunity for Aspire to explain and resolve its error. In the particular circumstances of this case and in light of the relevant regulations and their stated goals, such a decision can only be described as an abuse of discretion.

**C.     An Injunction is Appropriate to Remedy DeCA's Error.**

Although Aspire principally argues that the Court should remand this matter to DeCA to allow Aspire to clarify its error, such relief would be injunctive in nature as it would set aside DeCA's disqualification of Aspire and direct the agency to take certain actions. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 n.6 (Fed. Cir. 2004) ("[A]n injunction either mandates or prohibits particular conduct." (citing *Perez v. Ledesma*, 401 U.S. 82, 124 (1971)). At oral argument, the Government conceded that, if it were to lose on the merits, an injunction would be appropriate. It likewise clarified that it does not contest the other injunction factors aside from success on the merits. In response, Aspire agreed at oral argument that an injunction would be appropriate should the Court rule in its favor on the merits. *See* ECF No. 21-1 at 36 (arguing in the alternative that Aspire meets the injunctive relief standard).

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA*, 389 F.3d at 1228–29. For the reasons explained above, Aspire has demonstrated success on the merits. Aspire will also suffer

irreparable harm without an injunction because it has been eliminated from consideration for award. *Wackenhut Servs., Inc. v. United States*, 85 Fed. Cl. 273, 311 (2008) ("a protester suffers irreparable injury, when it has been deprived the opportunity to compete fairly for a contract"). The balance of harm favors Aspire, since the detriment to Aspire's ability to compete in the absence of an injunction outweighs the effect that injunctive relief will have DeCA's on-going evaluation. *See G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 419 (2022) (balance of harms favored plaintiff where government was obligated to conduct proper procurement and lack of injunction would be "detrimental to Plaintiffs' ability to meaningfully compete for the contract"). Correlatively, the public interest is served through an injunction by upholding the integrity of the procurement process and increasing competition. *See KWV, Inc. v. United States*, 111 Fed. Cl. 119, 128 (2013) ("the public has a strong interest in a fair and competitive procurement process").

Accordingly, each of the factors favors injunctive relief to remedy the Government's arbitrary and capricious rejection of Aspire's proposal.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Aspire's Motion for Judgment on the Administrative Record (ECF No. 21) and **DENIES** the Government's Cross-Motion for Judgment on the Administrative record (ECF No. 25). The Court hereby sets aside DeCA's decision to reject Aspire's proposal without further evaluation. DeCA shall restore Aspire to the competition, allow Aspire to resolve the labor hour discrepancy in its proposal through clarification pursuant to FAR 15.306, and evaluate Aspire's corrected proposal consistent with this opinion. The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after June 9, 2023, unless the parties submit **by no later than June 6, 2023**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

      **SO ORDERED**.

Dated: May 30, 2023                       *_/s/ Kathryn C. Davis_*
                                         KATHRYN C. DAVIS
                                         Judge